*432 SUMMARY ORDER
Debtor-Appellant Delta Air Lines, Inc. and Appellant the Post Effective Date Committee of Delta Air Lines, Inc. (collectively, “Delta”) appeal from an Opinion and Order of the United States District Court for the Southern District of New York (Scheindlin, J.) entered on May 8, 2008, 387 B.R. 426. The district court reversed the bankruptcy court’s order disallowing the claims made by Lone Star Air Partners, LLC (“Lone Star”) and directed the bankruptcy court to reinstate those claims. We assume the parties’ familiarity with the facts, the procedural history, and the issues on appeal.
A. Background
This appeal arises out of objections by Delta to claims filed by Lone Star in Delta’s Chapter 11 bankruptcy case. To protect against risks arising from the leveraged lease of three aircraft, Lone Star and Delta had entered into Tax Indemnification Agreements (“TIAs”), which provided that Delta would indemnify Lone Star if Lone Star incurred certain kinds of tax losses and if those losses arose from certain specified acts or omissions of Delta and the Indenture Trustee. The scope of these TIAs is at issue in the instant litigation.
As a result of the sale of its interests in aircraft leased to Delta, Lone Star incurred various tax losses in excess of $15,635,813, for which it now seeks indemnification under the TIAs. Lone Star filed claims in the bankruptcy court on the basis that the TIAs mandate Delta indemnify Lone Star’s losses where those losses arise due to a sale of its ownership interests that was “attributable to” the “exercise of a remedy” under Section 15 of the Leases. Delta filed an objection to Lone Star’s claims, arguing that Lone Star was not entitled to indemnification under the terms of the TIAs.
The parties agree that the relevant provisions of the three TIAs are identical. Under Section 6, Delta is required to indemnify Lone Star if Lone Star suffers any described tax loss “as the result of ... any act or omission” by Delta. Section 7 excludes certain events from the Section 6 indemnification obligation. In pertinent part, Section 7(a) states:
SECTION 7. Excluded Events. Notwithstanding any provision to the contrary contained in Section 6 hereof, the Owner Participant[1] shall not be entitled to any payment under Section 6 hereof to the extent any Loss or Foreign Tax Credit Loss arises as a result of one or more of the following events:
(a) any voluntary or involuntary sale or other disposition (other than a substitution or replacement) by the Owner Participant of the Aircraft or any interest or beneficial interest therein or in the Trust Estate or any part thereof, unless a Lease Event of Default shall have occurred and be continuing at the time of such sale or disposition and such sale or disposition is attributable to the exercise of a remedy available to the Owner Participant pursuant to Section 15 of the Lease in response to the occurrence of such Lease Event of Default. ...
The relevant “Excluded Event” is “any voluntary sale ... by the Owner Participant of ... any ... beneficial interest ... in the Trust Estate.” The parties do not dispute that, apart from the “unless” clause, Lone Star’s voluntary sale of its *433 interests as an Owner Participant in the Owner Trusts constituted an Excluded Event under Section 7(a). Thus, to demonstrate its entitlement to indemnification Lone Star must show that both requirements of the “unless” clause of subsection (a) are applicable. Neither do the parties dispute that the first requirement of the “unless” clause is satisfied: a Lease Event of Default occurred and was continuing at the time of sale. What is in dispute is the second requirement — that is, whether the “sale ... is attributable to the exercise of a remedy available to the Owner [Trustee] pursuant to Section 15 of the Lease.”
Section 15 of the Lease Agreement provides for “remedies” that “[u]pon the occurrence of any Lease Event of Default and at any time thereafter so long as the same shall be continuing, Lessor may ... do----” Section 15(b) allows the Lessor to “sell or otherwise dispose of the Aircraft or any part thereof (including any Engine), at public or private sale....” Section 15(f) provides that the Lessor may “terminate this Lease as to the Airframe or any Engine, or exercise any other right or remedy which may be available under applicable law or proceed by appropriate court action to enforce the terms hereof or to recover damages for the breach hereof.”
The bankruptcy court concluded that the agreement was not ambiguous and that the “ordinary, natural meanings” of the terms lead to a clear result. The bankruptcy court interpreted Section 7(a) to require the “actual” exercise of a remedy, rather than the “expectation” or even the “inevitable chance” that “remedies will be exercised in the future.” It found that no “exercise of a remedy” had occurred because, “at most,” the Indenture Trustee had contemplated the “future” exercise of a remedy. Further, the bankruptcy court found in the alternative that there was no sale “attributable to” the exercise of a remedy. According to the court, the sole act that caused a tax loss was Lone Star’s “voluntary” decision to sell its interests in the trusts. The bankruptcy court sustained Delta’s objections to Lone Star’s claims, holding that Lone Star had no right to indemnification under the TIAs because Lone Star’s sale of its interests was not “attributable to the exercise of a remedy” under the Leases.
The district court agreed that the language of Section 7(a) was unambiguous. Nevertheless, the district court reversed the bankruptcy court, ruling that Lone Star’s sale of its interests in the aircraft was “attributable to” the “exercise of a remedy” under Section 15 of the Leases and, therefore, Delta was obligated to indemnify Lone Star for its tax losses. The district court concluded that Lone Star’s actions were “clearly in response to the Indenture Trustee’s exercise of a remedy,” observing that Lone Star “chose the option that best preserved the value of its assets” and that its “decision to sell its interest was ‘attributable to’ the choice of either consenting to restructuring or foreclosure pursuant to the terms of the Bingham Term Sheet.”[2] According to the district court, the sale was “the natural product of the renegotiation of the Leases,” and was therefore “attributable to” an “exercise of a remedy.” The district court directed the bankruptcy court to reinstate Lone Star’s *434 claim and Delta’s appeal to this Court followed.
B. Standard of Review
“In an appeal from a district court’s' review of a bankruptcy court ruling, our review of the bankruptcy court is independent and plenary.” Bell v. Bell (In re Bell), 225 F.3d 203, 209 (2d Cir.2000) (citing FCC v. NextWave Personal Communications, Inc. (In re NextWave Personal Communications, Inc.), 200 F.3d 43, 50 (2d Cir.1999) (per curiam)); see also Kabro Assocs. v. Colony Hill Assocs. (In re Colony Hill Assocs.), 111 F.3d 269, 273 (2d Cir.1997) (“A district court’s order in a bankruptcy case is subject to plenary review.”). This Court accepts the bankruptcy court’s factual findings unless clearly erroneous, but reviews its conclusions of law de novo. In re Bell, 225 F.3d at 209. “The question of whether the language of a contract is clear or ambiguous is a question of law to be decided by the court,” Compagnie Financien de CIC et de L’Union Europeenne v. Merrill Lynch,, Pierce, Fenner & Smith, Inc., 232 F.3d 153, 158 (2d Cir.2000), and thus is subject to de novo review.
C. Applicable law and analysis
The inquiry here “is one of contract interpretation. Hence, our initial focus is on the language of the contract.” Phillips v. Audio Active Ltd., 494 F.3d 378, 386 (2d Cir.2007). This Court has stated that:
Contracts should be viewed in the light in which they were made. “The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties’ intent. ... ‘The best evidence of what parties to a written agreement intend is what they say in them writing.’ ” Greenfield, v. Philles Records, Inc., 98 N.Y.2d 562, 569, 750 N.Y.S.2d 565, 780 N.E.2d 166 (2002) (quoting Slamow v. Del Col, 79 N.Y.2d 1016, 1018, 584 N.Y.S.2d 424, 594 N.E.2d 918 (1992)).
Postlewaite v. McGraw-Hill, Inc., 411 F.3d 63, 69 (2d Cir.2005).
Each party claims that the plain language of the' agreements unambiguously supports its interpretation. As we have previously stated, “[ujnambiguous language has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself and concerning which there is no reasonable basis for a difference in opinion.” Compagnie Financiere de CIC et de L’Union Europeenne, 232 F.3d at 159 (quoting Seiden Assoc. Inc. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir.1992)) (internal quotation marks omitted). “Contract language is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement.” Id. at 158 (internal quotation marks omitted). In reviewing two contract interpretations, “we need not determine which is the more likely interpretation; we need merely decide whether each ... is sufficiently reasonable to render the clause ambiguous.” Mellon Bank, N.A. v. United Bank Corp. of N.Y., 31 F.3d 113, 115 (2d Cir.1994) (internal quotation marks, alteration, and citation omitted). We note that while both the bankruptcy court and the district court found that the contract language at issue was not ambiguous, the two courts disagreed as to what that language meant. More importantly, each court articulated a reasonable basis for its interpretation of the relevant terms. Accordingly, we find as a matter of law that the terms “attributable to” and “the exercise of a remedy” are ambiguous.
In general, “interpretation of ambiguous contract language is a question of fact to be resolved by the factfinder,” Compagnie *435 Financiere de CIC et de L’Union Europeenne, 232 F.3d at 158, although this Court “may resolve ambiguity in contractual language as a matter of law if the evidence presented about the parties’ intended meaning is so one-sided that no reasonable person could decide the contrary.” Id. (quoting 3Com Corp. v. Banco do Brasil, S.A., 171 F.3d 739, 746-47 (2d Cir.1999)) (internal quotation marks and brackets omitted). Because the bankruptcy court did not conduct an evidentiary hearing, the extrinsic evidence in the record is insufficient for this Court to decide upon a reasonable interpretation of the relevant contractual language based on “the evidence presented.” Id. For these reasons, it is appropriate to return this case to the bankruptcy court so it may conduct such a hearing.
On remand, the bankruptcy court should look to extrinsic evidence to determine the meaning of the phrase “attributable to the exercise of a remedy” as used in the parties’ written agreement. Depending on the results of that determination, the court may also need to make factual determinations regarding (1) whether Lone Star’s tax loss was, in fact and under the terms of the agreement, “attributable to the exercise of a remedy,” and (2) the extent of that loss.
For the reasons stated herein, we VACATE the Opinion and Order of the district court and REMAND this case to the district court with instructions to return the case to the bankruptcy court for further proceedings consistent with this Summary Order.

. Both parties agree that use of the term "Owner Participant” in this provision was a drafting error because the Owner Participant is not a party to the Lease. The provision instead should have made reference to the "Owner Trustee.”

. As part of Delta's reorganization under Chapter 11, Delta and the Indenture Trustee agreed to a Modified Restructuring Term Sheet (known as the "Bingham Term Sheet”), which addressed many of Delta's leased airplanes, including the Lone Star aircraft. The Bingham Term Sheet called for a restructuring of the Leases at issue, but the Leases could not be restructured without Lone Star's consent or foreclosure of Lone Star's interests.